UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT BECKLEY

JENNIFER D. COX,

        Plaintiff,

v.                                           CIVIL ACTION NO. 5:21-cv-00076

RALEIGH GENERAL HOSPITAL, LLC,
a limited liability company, and
ALDRINA ARCHIE, an individual,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants Raleigh General Hospital, LLC (the "Hospital") and Aldrina Archie's ("Archie") (collectively, the "Defendants") Partial Motion to Dismiss Plaintiff's First Amended Complaint. (ECF No. 24.) For the reasons more fully explained below, Defendants' motion is **GRANTED**.

I.    BACKGROUND

This action arises out of the alleged wrongful discharge of Plaintiff Jennifer Cox ("Plaintiff") from her employment at the Hospital. The following allegations are drawn from Plaintiff's First Amended Complaint. (ECF No. 22.)

Plaintiff, a resident of Raleigh County, West Virginia, was hired by the Hospital's predecessor on December 4, 1996. (*Id.* at ¶¶ 1, 4.) On July 27, 2006, Plaintiff began serving in the position of Assistant Patient Access Director of Registration. (*Id.* at ¶ 5.) In this position, Plaintiff "was specifically instructed by her superiors at [the Hospital] on the procedure for registering incoming patients[.]" (*Id.* at ¶ 8.) Plaintiff was further responsible for supervising

Patient Registration staff and implementing the Patient Registration procedures. (*Id.* at ¶ 9.) Plaintiff was supervised by the Patient Access Director of Registration, a role held by Archie beginning in May 2019. (*Id.* at ¶ 7.) Plaintiff was also supervised by Timothy Lessing and Matthew Roberts, the Hospital's Chief Financial Officer and Chief Executive Officer, respectively. (*Id.* at ¶ 6.) Plaintiff asserts that neither she nor any member of her staff were responsible for "authorizing, generating, or sending bills to patients or other payors; for providing medical services; or for establishing any policies or procedures for [the Hospital]." (*Id.* at ¶ 10.)

Between December 9 and December 11, 2019, Plaintiff alleges that auditors from the West Virginia Office of Health Facility Licensure and Certification (OHFLAC) were on site at the Hospital to conduct an audit in response to an allegation of non-compliance with the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd. (*Id.* at ¶¶ 33–34.) During this audit, the auditors requested a review of eight patient records in which the consent forms[1] were not signed by the patient or were "otherwise irregular." (*Id.* at ¶ 35.)

On December 10, Plaintiff alleges she was called into a meeting with Mr. Roberts, where he expressed his displeasure with Plaintiff over concerns identified by the OHLFAC auditors. (*Id.* at ¶ 36.) Plaintiff responded by identifying her own concerns with perceived flaws in the registration process, including medical service in the emergency room, where patients could be treated and discharged before completing registration and signing the consent forms. (*Id.*) Plaintiff, however, could only voice her concerns, as she alleges that she "had no authority to

---

[1] A "consent form" is a form generated after the "preregistration" process, where the patient is identified and entered in the system, which the patient then signs indicating the patient's consent to be medically treated. (ECF No. 22 at ¶¶ 12–15.) In some instances, patients may decline or neglect to sign a consent form, which the registration team would note and subsequently "follow up" with the patient to ensure the form was signed. (*Id.* at ¶¶ 23–26.) Plaintiff alleges that, as "known by [the Hospital], but never relayed to" her, the Hospital is precluded from billing patients when there is no signed consent form, pursuant to "federal law." (*Id.* at ¶ 31.)

change or institute hospital policy," and thus could only comply with instructions from her superiors. (*Id.* at ¶ 37.) Thereafter, Mr. Roberts asked Plaintiff to explain her concerns to Chief Operating Officer Austin Wratchford and Chief Nursing Officer Debbie Vaughn. (*Id.* at ¶ 38.)

Regarding the files identified by the OHFLAC auditors, Plaintiff was then tasked with "generating a report" that addressed those concerns, which she produced the next day on December 11. (*Id.* at ¶¶ 39–40.) Plaintiff provided her report in a meeting with Mr. Lessing and Defendant Archie. (*Id.* at ¶ 41.) Mr. Lessing and Archie also discussed Plaintiff's concerns with the registration process at this meeting. (*Id.*) When Plaintiff gave her recommendations to address the concerns she identified, Archie allegedly told Plaintiff that "that's never going to happen," and asked Plaintiff to surrender the report to her and not the OHFLAC auditors. (*Id.* at ¶ 43.) The following day, December 12, Plaintiff and Archie met with some of the registration team leaders to review the accounts in Plaintiff's report. (*Id.* at ¶ 44.)

Plaintiff then attended a meeting on December 17 where she was informed by the Hospital's Human Resources Director Laura Martin and Defendant Archie that she was suspended from work, pending an investigation into "fraudulent billing." (*Id.* at ¶ 45.) Then, on December 20, 2019, Plaintiff's employment was terminated. (*Id.* at ¶ 47.) Plaintiff alleges that her termination "ensured that she had no opportunity to explain to the OHFLAC auditors that she and the other members of [the Hospital] staff had been following [its] longstanding procedures in the case of patients" who neglected to sign their consent forms. (*Id.* at ¶ 48.)

During her exit interview on December 20, Ms. Martin informed Plaintiff that the reason for her termination was the lack of signatures on consent forms. (*Id.* at ¶ 49.) In particular, Plaintiff alleges that Ms. Martin stated that the Hospital "pulled a lot of records and looked at a lot

3

of different things," including the results of the OHFLAC audit. (*Id.* at ¶ 50.) Ms. Martin also explained that Plaintiff had been suspended as a result of her discussion with Archie and Mr. Lessing on December 11, where Plaintiff had explained her perceived issues with the registration process. (*Id.* at ¶ 52.) Ms. Martin allegedly told Plaintiff that her handling of patient files is "basically fraud," while referencing the "ACTIVE patient record" step in the Hospital's protocols. (*Id.* at ¶ 53.) Ms. Martin continued, stating that Plaintiff was being terminated because she "should know how things should work and because of her training." (*Id.* at ¶ 54.) Ms. Martin stated further that Plaintiff's handling of the patient records was "a violation of the code of conduct," and specifically mentioned sections of the code that addressed "behaving in an ethical manner and in a proper manner," and that "violation of patient rights as far as making patients aware of what they are signing." (*Id.* at ¶ 55.) Ms. Martin allegedly stated that "these [patients] didn't even sign anything, and we still billed them. That's like, huge." (*Id.* at ¶ 56.)

Ms. Martin then gave Plaintiff a "Corrective Counseling/Behavioral Accountability Record," which documented the reasons for her termination. (*Id.* at ¶ 57.) The reasons listed were for violations of the "Life Point Hospitals Code of Conduct," "RCCH Policy EMTALA Medical Screening exams and Stabilization," and "On 12/11/19 employee at her own admittance stated that she failed to follow policy." (*Id.*) Ms. Martin then elaborated, stating that the decision to terminate Plaintiff's employment was based on Plaintiff's own admission to Mr. Lessing and Archie regarding the follow up actions of one Mr. Stewart, a registration staff member, and Plaintiff's responsibility for supervising that individual. (*Id.* at ¶ 60.)

During this exit interview, Plaintiff alleges that she requested a witness, which was denied. (*Id.* at ¶ 63.) Ms. Martin explained that the decision to terminate Plaintiff's employment was "a

joint decision [that included] me, all of administration, and our corporate HSC." (*Id.* at ¶ 64.) Ms. Martin also stated that the termination was based "on the fact that there's a federal audit out there and hasn't made it back yet." (*Id.* at ¶ 65.) Ms. Martin indicated that these patient follow-ups had "been going on for a minute," apparently meaning that the procedures began prior to her tenure as the Director of Registration. (*Id.* at ¶¶ 67–68.) Ms. Martin described these actions as "egregious," as the Hospital had "billed people that haven't gone through the proper procedure." (*Id.* at ¶ 69.)

Following this meeting, on December 20, Plaintiff alleges that Archie approached one Lana Hairston and informed her of Plaintiff's termination, stating that Plaintiff "had violated [*sic*] code of conduct" and said that her termination was due to practices that had "started before she was hired as P.A.D." (*Id.* at ¶ 73.) Plaintiff further alleges that Ms. Martin told various members of the Hospital staff about Plaintiff's termination, and that the decision was due to "an admission of [Plaintiff] knowing of something unethical taking place." (*Id.* at ¶ 74.) Plaintiff further alleges that the Hospital opposed her application for unemployment benefits, and that the OHFLAC audit's final report made no mention of any fraudulent billing practices. (*Id.* at ¶¶ 75–76.)

Plaintiff filed her original complaint in the Circuit Court of Raleigh County, West Virginia, on December 18, 2020. (ECF No. 1–1.) On January 28, 2021, the Hospital removed the action to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. (ECF No. 1.) On June 1, 2021, and pursuant to an order by this Court, Plaintiff filed her First Amended Complaint, in which she asserts four causes of action. (ECF No. 25.) Count I asserts a claim for defamation against both the Hospital and Archie; Count II asserts a claim for wrongful discharge in violation of public policy against the Hospital; Count III asserts a claim for outrage, otherwise

known as the intentional infliction of emotional distress ("IIED"); and Count IV asserts a claim against the Hospital for a violation of the West Virginia Wage Payment and Collection Act. (*Id.* at 14–18.)

On June 11, 2021, Defendants filed the instant Partial Motion to Dismiss. (ECF No. 24.) Plaintiff timely filed her response in opposition on June 25. (ECF No. 26.) Defendants thereafter replied on July 2. (ECF No. 27.) This action was subsequently reassigned from Judge Volk to the undersigned on October 12, 2021. (ECF No. 39.) Following a status conference in this matter on November 5, 2021, Plaintiff, with leave of Court, filed a supplemental response in opposition. (ECF No. 51.) Defendants timely submitted their reply to the supplemental response on November 22, 2021. (ECF No. 52.) With the briefing on this motion complete, it is now ripe for adjudication.

## II. LEGAL STANDARD

A pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (stating that this requirement exists "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To withstand a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead enough facts "to state a claim to relief that is plausible on its face." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

678. Stated another way, the factual allegations in the complaint "must be sufficient 'to raise a right to relief above the speculative level.'" *Woods v. City of Greensboro*, 855 F.3d 639, 647 (4th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. This Court then "assume[s] the[ ] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* "[T]o satisfy the plausibility standard, a plaintiff is not required to plead factual allegations in great detail, but the allegations must contain sufficient factual heft to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of that which is alleged." *Nanni v. Aberdeen Marketplace, Inc.,* 878 F.3d 447, 452 (4th Cir. 2017) (internal quotation marks omitted).

### III. DISCUSSION

Defendants move for the dismissal of Counts I, III, and IV. (ECF No. 24.) Defendants concede that Plaintiff's wrongful discharge claim "meet[s] the minimal pleading standards," but do not admit that it "has any merit," and thus have not moved for its dismissal at this stage. (ECF

No. 25 at 2, n.2.) The Court shall thus take up Defendants' arguments in the order presented, beginning with Plaintiff's claim of defamation.

A. *Count I – Defamation*

Defendants first argue that Plaintiff has not sufficiently pled a claim for defamation because she has not established that the alleged comments by Archie were defamatory or false. (*Id.* at 4.) To begin, Defendants maintain that the reason given for Plaintiff's termination was the absolute truth, which serves as a "complete defense to an allegation of defamation[.]" (*Id.* at 3–4 (quoting *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 79 (W. Va. 1983).) Additionally, Defendants argue that Archie's alleged statement that Plaintiff was terminated due to her "admission of [Plaintiff] knowing something unethical taking place," cannot be defamatory because it was an expression of an opinion and is impossible to prove or disprove. (*Id.* at 5.) Finally, Defendants assert that Archie's alleged statements were privileged, thereby entitling her to "qualified immunity," as the information was only communicated to members of the Hospital's registration team who had a "legitimate and reasonable interest" in their former supervisor no longer being employed by the Hospital. (*Id.* at 5–6.)

In response, Plaintiff contends that she has sufficiently pled each element to support a claim for defamation and that any assertion of privilege is an "affirmative defense" that must be proved by Defendants. (ECF No. 26 at 2.) Plaintiff also attacks the "sophistic logic" of Defendants' argument, stating that the defamatory statement is not *why* Plaintiff was terminated but instead *that* Plaintiff is unethical. (*Id.* at 3.) Finally, Plaintiff argues that qualified immunity is a factual inquiry and "demands that the Defendants prove the basis for privilege." (*Id.*)

8

"The essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. Pt. 5, *Belcher v. Wal-Mart Stores, Inc.*, 568 S.E.2d 19, 22 (W. Va. 2002). A plaintiff may establish a claim by showing that "false and defamatory statements were made against him, or relating to him, to a third party who did not have a reasonable right to know, and that the statements were made at least negligently on the part of the party making the statements, and resulted in injury to the plaintiff." *Bine v. Owens*, 542 S.E.2d 842, 846 (W. Va. 2000).

The only statements being challenged here are those made by Archie to the Hospital staff. The parties do not dispute that these statements were made nor do they contest any of the circumstances surrounding these statements. Thus, it is apparent that whether this claim survives dismissal turns on whether the communications made by Archie were privileged. The Court will thus turn to the second element articulated in *Belcher*: A nonprivileged communication to a third party. The thrust of Defendants' argument as to this element is that the statements Archie allegedly made were conditionally privileged, otherwise known as a qualified privilege.

"As referenced above, as an essential element of a defamation claim, the plaintiff must demonstrate that the defendant made false and defamatory statements 'to a third party who did not have a reasonable right to know . . . .'" *Id.* (quoting *Bine*, 542 S.E.2d at 846). In relation to this element of a nonprivileged communication, the Supreme Court of Appeals of West Virginia has long recognized the existence of qualified privileges as a defense to tort claims. *See, e.g.*, *Swearingen v. Parkersburg Sentinel Co.*, 26 S.E.2d 209, 215 (W. Va. 1943). "In an action for defamation, if there is no dispute as to the words written or spoken, the fact of publication and

9

other surrounding circumstances, the question of privilege or the lack thereof is one of law for the court." *Id.*

The West Virginia Supreme Court explained the foundations for a qualified privilege as follows:

> Qualified privileges are based upon a public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public. . . . A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter. . . . [A] bad motive will defeat a qualified privilege defense.

*Crump*, 320 S.E.2d at 78 (internal citations omitted). In other words, a defendant may assert a qualified privilege "when he acts to protect or advance his own legitimate interests, the legitimate interests of others or the legitimate interests of the public." *Dzinglski v. Weirton Steel Corp.*, 445 S.E.2d 219, 227 (W. Va. 1994); *Parker v. Appalachian Elec. Power Co.*, 30 S.E.2d 1, 4 (W. Va. 1944). "A qualified privilege usually extends to employer-employee relations." *Mauck v. City of Martinsburg*, 280 S.E.2d 216, 221 (W. Va. 1981).

In the matter at hand, Plaintiff has failed to sufficiently plead that the communications by Archie to the Hospital's registration team were nonprivileged. As the parties do not dispute the contents of the alleged statements nor to whom the statements were made, the question of privilege is one of law. *See Swearingen*, 26 S.E.2d at 215. Archie made the purportedly defamatory statements while informing the registration team that Plaintiff, their supervisor and coworker, was no longer employed by the Hospital. (ECF No. 22 at ¶ 74.) Naturally, Plaintiff's former subordinates and coworkers in the Hospital would have a legitimate and reasonable interest in her termination, and Archie's communication of that termination "foster[ed] the free flow of

10

information . . . [in] the employer-employee relationship." *See McKinney v. K-Mart Corp.*, 649 F. Supp. 1217 (S.D. W. Va. 1986). *See also Albert v. Losken*, 239 F.3d 256, 272 (2d Cir. 2001) ("Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege."); *Garziano v. E.I. Du Pont De Nemours & Co.*, 818 F.2d 380, 387 (5th Cir. 1987) ("Co-workers have a legitimate interest in the reasons a fellow employee was discharged."). In fact, Plaintiff seems to implicitly acknowledge that the statements were made in the context of the employer-employee relationship, as she alleged that Archie made the statements "in her capacity as Patient Access Director[.]" (ECF No. 22 at ¶ 82.) Thus, Archie was also protecting her own legitimate interests and those of the Hospital, as "[a]n employer also has an interest in maintaining employee morale and protecting its business interests." *Garziano*, 818 F.2d at 387. In short, Plaintiff has failed to sufficiently allege that this communication was nonprivileged.[2] Moreover, Plaintiff's Amended Complaint lacks any allegations as to bad motive, as would be required to overcome the qualified privilege. *See Crump*, 320 S.E.2d at 78.

For the foregoing reasons, Defendants' motion is **GRANTED** as to Count I of the Amended Complaint, and Count I is therefore **DISMISSED**.

B. *Count III – Intentional Infliction of Emotional Distress*

Defendants next move for the dismissal of Count III, intentional infliction of emotional distress ("IIED"). In support of dismissal, Defendants argue that the claim is first barred by the exclusivity provision of the West Virginia Workers' Compensation Act (the "Act"), W. Va. Code

---

[2] As this finding is dispositive to Plaintiff's defamation claim, the Court declines to take up Defendants' asserted defenses of absolute truth or opinion. (*See* ECF No. 25 at 4–5.)

11

§ 23-2-6. (ECF No. 25 at 6.) Next, Defendants assert that Plaintiff has failed to sufficiently allege facts that would support a claim for IIED. (*Id.* at 8.) In particular, Defendants argue that Plaintiff has failed to plead a cause of action for IIED in three ways: (1) she has failed to allege facts that are "outrageous"; (2) she has failed to allege facts that show the Hospital intended to cause emotional distress or harm; and (3) she has failed to allege that she suffered severe emotional distress. (*Id.* at 9–12.)

Plaintiff responds by "ask[ing] the Court to consider" the allegations of Plaintiff's Amended Complaint. (ECF No. 26 at 5.) Plaintiff then asserts that whether the Act grants immunity to claims of IIED is still "an open question in West Virginia jurisprudence." (*Id.* at 6.) Yet, even if the immunity did apply to her termination, Plaintiff asserts that "most of the more offensive acts," including "the defamation, the humiliation of being ordered from the premises and having her desk searched, emptied and the contents carried off by security officers," all occurred after her termination and therefore would not be covered by the provisions of the Act. (*Id.* at 6.) The Court notes that Plaintiff has not cited to any authority, mandatory or otherwise, to support these assertions.

Under West Virginia law, to prevail on a claim for IIED, a plaintiff must establish the following four elements:

> (1) the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from its conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. pt. 3, *Travis v. Alcon Laboratories, Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998). "Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." *O'Dell v. Stegall*, 703 S.E.2d 561, 594 (W. Va. 2010); Syl. Pt. 4, *Travis*, 504 S.E.2d at 421. "Outrageous" requires a showing that the conduct is "more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct." *Travis*, 504 S.E.2d at 425. "In fact, 'it is not enough that the defendant acted with a tortious intent' or even that 'the defendant's conduct could be characterized as malicious.'" *Insco v. Wexford Health Sources, Inc.*, Civ. Action No. 2:19-cv-00612, 2020WL 2770419 at *9 (S.D. W. Va. May 28, 2020). The alleged conduct must be "so outrageous in character, and so extreme in degree, as to go *beyond all possible bounds of decency*, and to be regarded as *atrocious* and *utterly intolerable* in a civilized society." *Keyes v. Keyes*, 392 S.E.2d 693, 696 (W. Va. 1990) (emphasis in original).

The immunity provision of the West Virginia Workers' Compensation Act provides as follows:

> Any employer subject to this chapter who subscribes and pays into the workers' compensation fund the premiums provided by this chapter or who elects to make direct payments of compensation as provided in this section is not liable to respond in damages at common law or by statute for the injury or death of any employee, *however occurring*, after so subscribing or electing, and during any period in which the employer is not in default in the payment of the premiums or direct payments and has complied fully with all other provisions of this chapter.

W. Va. Code § 23-2-6 (emphasis added). The West Virginia Supreme Court has interpreted this section as granting employers "sweeping immunity" from tort claims resulting in injuries, including emotional distress, that occur "in the course of and resulting from employment." *Bias v. E. Ass'd. Coal Corp.*, 640 S.E.2d 540, 544 (W. Va. 2006). An employer may lose this immunity in only one of three ways: (1) by defaulting in payments required by the Act, or otherwise falling

13

into noncompliance with its provisions; (2) acting with "deliberate intent" to cause an employee's injuries; or (3) where the Legislature has expressly authorized, by statute, a private remedy outside of the workers' compensation system. *Id.* at 546.

Far from an open question, it is well settled that the sweeping scope of the immunity provisions of the Act encompasses claims for IIED. *See Miklewski v. Talbott Pers. Care, Inc.*, 2020 WL 4722384, *2 (N.D. W. Va. Aug. 13, 2020) ("This Court agrees with the defendants that the tort of outrage/IIED claim is barred by workers' compensation immunity."); *Fugate v. Frontier West Virginia, Inc.*, Civ. Action No. 2:17-cv-00559, 2017 WL 3065216 at *5 (S.D. W. Va. July 19, 2017); *State ex rel. City of Martinsburg v. Sanders*, 632 S.E.2d 914, 920 (W. Va. 2006) ("Insofar as Respondents try to raise claims against the employer for negligent conduct, emotional distress or the like, Martinsburg is protected by the statutory remedy available through the Workers' Compensation system."); *Miller v. City Hosp., Inc.*, 475 S.E.2d 495, 501–02 (W. Va. 1996) (finding plaintiff's claim of outrage fell within scope of Act's immunity provision). As noted, however, there are some narrow exceptions to this sweeping grant of immunity. Yet, Plaintiff has failed to allege facts that the Hospital has failed to comply with the Act or acted with deliberate intent.[3]

---

[3] Plaintiff's allegations of outrage, an intentional tort, are insufficient to plead deliberate intention to cause injury. In order for a claim of outrage to fall outside the Act's immunity provisions, "the plaintiff must plead facts that suggest 'an actual, specific intent.'" *Councell v. Homer Laughlin China Co.*, 823 F. Supp. 2d 370, 384 (N.D. W. Va. 2011) (quoting *Weirton Health Partners, LLC v. Yates*, No. 5:09-cv-40, 2010 WL 785647, at *6 (N.D. W. Va. Mar. 4, 2010)). Allegations of "(i) [c]onduct which produces a result that was not specifically intended; (ii) conduct which constitutes negligence, no matter how gross or aggravated; or (iii) willful, wanton or reckless misconduct" are insufficient." W. Va. Code § 23-4-2(d)(2)(A). In support of Count III, her outrage claim, Plaintiff alleges that the Hospital's actions were "intentional, willful, reckless, and wanton, and in gross disregard of [Plaintiff's] right to be free from callous and malicious attack." (ECF No. 22. at ¶ 95.) These conclusory and threadbare allegations are insufficient to plead deliberate intention. *Councell*, 823 F. Supp. 2d at 384 (granting motion to dismiss intentional infliction of emotional distress claim on similar grounds). *See also Dzinglski*, 445 S.E.2d at 227 ("The facts of the case before us do not rise to the level of conduct necessary to satisfy the tort of outrage. When Mr. Lawson apprised Weirton Steel of improprieties by one of its management employees, Weirton Steel did what it is the right and indeed the obligation of any employer to do: it investigated the allegations of impropriety.").

Plaintiff's argument that "most of the offensive acts" were committed after her termination, including her having her desk searched, being escorted from the property, and the alleged defamatory statements detailed above, is not persuasive. Plaintiff misunderstands the breadth of the immunity provision, as it provides near total immunity from common law tort liability for injuries to employees *however occurring* and arising from their employment. *See Councell v. Homer Laughlin China Co.*, 823 F. Supp. 2d 370, 384 (N.D. W. Va. 2011); *State ex rel. Frazier v. Hrko,* 203 W.Va. 652, 659, 510 S.E.2d 486 (W. Va. 1998) ("The employer is entitled to immunity for any injury occurring to an employee and 'shall not be liable to respond in damages at common law or by statute.'" (quoting W. Va. Code § 23–2–6). An argument that an emotional injury resulting from Plaintiff cleaning out her desk at her workplace immediately following the termination of her employment cannot be seriously considered as separate and apart from her employment such as to not fall within the grant of immunity.

Finally, even if Plaintiff's claim was not barred by the immunity granted by the Act, she still has failed to allege facts sufficient to support a cause of action for IIED. First, Plaintiff has failed to allege outrageous conduct on behalf of the Hospital or Archie. At worst, Plaintiff has asserted that a "whispering campaign" began following her termination, in which her former coworkers discussed the circumstances of her firing. (ECF No. 22 at ¶ 74.) Workplace gossip of this type, while perhaps embarrassing, is certainly not outrageous. Moreover, she has not alleged any facts that would show that the Hospital or Archie actually intended to cause her emotional distress. *See Leonard v. Alcan Rolled Products-Ravenswood, LLC*, 2009 WL 3669340 at *5 (S.D. W. Va. Nov. 3, 2009) ("The plaintiffs have not shown that the defendants acted with an intent to inflict emotional distress, or recklessly 'when it was *certain or substantially*

15

*certain* emotional distress would result from [their] conduct.'") (quoting *Travis*, 504 S.E.2d at 425.) Lastly, Plaintiff has failed to allege that she has suffered any emotional distress, let alone distress "so severe that no reasonable person could be expected to endure it." *See Travis*, 504 S.E.2d. at 430. Plaintiff has only alleged in conclusory fashion that she was "emotionally distressed, traumatized, embarrassed and humiliated." (ECF No. 22 at ¶ 95.) These conclusory allegations are not sufficient for the Court to infer the severity of Plaintiff's distress to support a plausible claim for relief. *See Marfork Coal Co. v. Smith*, 2011 WL 744727, at *5 (S.D. W. Va. Feb. 23, 2011).

Therefore, for the foregoing reasons, Defendants' motion is **GRANTED** as to Plaintiff's claim for intentional infliction of emotional distress, and Count III is hereby **DISMISSED**.

C. *Count IV – Wage Payment and Collection Act*

Finally, Defendants seek the dismissal of Count IV which alleges a violation of the West Virginia Wage Payment and Collection Act ("WPCA"), W. Va. Code § 21–5–4(b). In support of its argument, the Hospital has attached Plaintiff's Statement of Earnings and Deductions, (ECF No. 24–1), which it says shows that the Hospital issued the payment of Plaintiff's unused but accrued paid time off ("PTO") on Friday, January 3, 2020, the day payments were due. (ECF No. 25 at 13.) Therefore, Defendants argue that Plaintiff has no cognizable claim under the WPCA, and Count IV must be dismissed as a matter of law.

In response, Plaintiff argues she was not paid her accrued time off until January 6, 2020, three days past when it was due. (ECF No. 26 at 7.) Plaintiff discounts Defendants' submitted exhibit of her Statement of Earnings and Deductions and instead argues that the payment was not actually deposited into her account until January 6. (*Id.*)

Following a status conference in this matter on November 5, 2021, Plaintiff requested and was granted the opportunity to file a supplemental response to Defendants' motion. In her supplemental response, Plaintiff appears to attack the validity of the Defendants' exhibit arguing that it "means nothing; the question is when the funds were available to [Plaintiff]." (ECF No. 51 at 3.) In support of this argument, Plaintiff points to the WPCA's allowance for the "direct deposit" of moneys owed, which she argues must be "immediately available," pursuant to the statute. (*Id.* at 2, n.4 (quoting W. Va. Code § 21-5-3(b)(4).) Plaintiff submits her own exhibit, consisting of requests for admission and a bank statement, that she argues shows the funds were not available to her until January 6. (*Id.* at 3–4.)

Defendants were granted a response to this supplemental filing. In their response, Defendants assert that Plaintiff could have raised this latest argument in her initial response, but did not thereby waiving it. (ECF No. 52 at 2.) Then, Defendants argue that even if Plaintiff's argument is considered, she still has not identified any authority that the proper inquiry into this alleged violation is when Plaintiff's bank made the funds available to her. (*Id.* at 3.) Instead, Defendants maintain that the proper inquiry is when the Hospital paid those funds, which was on January 3 as demonstrated by Plaintiff's Statement of Earnings. (*Id.*)

First, the Court agrees that Plaintiff could have, but did not, raise her later arguments in her initial response, and therefore waived them. *See Stevens v. Thornsbury*, Civ. Action No. 2:13-cv-31719, 2014 WL 3962478, at *4 (S.D. W. Va. Aug. 13, 2014). While the Court is cognizant that it granted Plaintiff's request to file a supplemental response during the November 5 status conference, the Court sees no legitimate reason why Plaintiff could not have raised this argument

17

in her initial response. *Id.* ("Failure to raise issues that should have been raised in an oppositional response is not grounds for invoking this Court's indulgence.")

Still, even if the Court were to entertain Plaintiff's argument, it is clearly without merit. "The [WPCA] is remedial legislation designed to protect working people and assist them in the collection of compensation wrongly withheld." Syl. pt. 3, *Jones v. Tri-County Growers, Inc.*, 366 S.E.2d 726 (W. Va. 1988). The WPCA provides, in pertinent part, as follows:

> Whenever a person, firm or corporation discharges an employee, or whenever an employee quits or resigns from employment, the person, firm or corporation shall pay the employee's wages due for work that the employee performed prior to the separation of employment on or before the next regular payday on which the wages would otherwise be due and payable.

W. Va. Code § 21-5-4(b). "[T]he timeliness of the payment of [an employee's] wages upon an employee's separation from employment is firmly within the purview of the WPCA." *Citynet, LLC v. Toney*, 772 S.E.2d 36, 52 (W. Va. 2015).

The WPCA allows for the payment of wages or moneys owed by "direct deposit." Specifically, payment may be made as follows:

> By any method of depositing immediately available funds in an employee's demand or time account in a bank, credit union, or savings and loan institution that may be agreed upon in writing between the employee and such person, firm, or corporation, which agreement shall specifically identify the employee, the financial institution, the type of account, and the account number[.]

W. Va. Code § 21-5-3(b)(4). Pursuant to these two sections of the WPCA, the parties seemingly agree that the payout of Plaintiff's PTO was due on her next regularly scheduled payday, January 3, 2020. (*Compare* ECF No. 26 at 13 *with* ECF No. 27 at 7.)

In support of their argument that Plaintiff's PTO was timely paid, Defendants attached Plaintiff's Statement of Earnings and Deductions to the original motion.[4] (*See* ECF No. 26–1.) This document also contains the label "Payroll Direct Deposit Voucher," and is dated January 3, 2020.[5] (*Id.*) Furthermore, it shows that an amount of $4,869.50 was deposited into Plaintiff's account. (*Id.*) This amount matches the amount indicated on Plaintiff's bank statements. (*Compare id. with* ECF No. 51–1 at 6.) There can be no reasonable dispute that the Hospital actually paid those funds on January 3, the date the funds were due Plaintiff.

Pursuant to the WPCA, whenever an employee leaves employment, the employer "shall pay the employee's wages due for work that the employee performed prior to the separation of employment on or before the next regular payday[.]" W. Va. Code § 21-5-4(b). "Shall," when used in this context and without language demonstrating contrary intent is "afforded a mandatory connotation." Syl. pt. 1, *Nelson v. West Virginia Pub. Emp. Ins. Bd.*, 300 S.E.2d 86 (W. Va. 1982). The West Virginia Supreme Court has been clear that this language "is straightforward in setting the time frame for an employer to pay wages to an employee" who leaves employment.

---

[4] While matters outside of the pleadings are typically not considered in a Rule 12 motion to dismiss, a reviewing court may rely on extrinsic evidence if the document is central to the complaint or otherwise sufficiently referred to therein. *See Witthohn v. Fed. Ins. Co.*, 164 Fed. App'x 395, 396–97 (4th Cir. 2006) (citing *Phillips v. LCI Intern, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). While Plaintiff has argued ardently against the Court's consideration of this document, including that she did not explicitly refer to it in her Amended Complaint, she has not challenged its authenticity. *See Phillips*, 190 F.3d at 618. Moreover, it is apparent that this document is integral to her claim and shall therefore be considered without converting this motion to one for summary judgment. See *Clark v. BASF Corp.*, 142 Fed. Appx. 659, 661 (4th Cir. 2005) ("When the plaintiff fails to introduce a pertinent document as part of her pleading, a significant number of cases from throughout the federal court system make it clear that the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading").

[5] A "deposit voucher," such as this, is a document used by a business's accounts payable department "to gather and file all of the supporting documents needed to approve and track the payment of a liability," in this case, Plaintiff's accrued PTO. *See* Adam Hayes, *Voucher Check*, INVESTOPEDIA (Feb. 26, 2021), https://www.investopedia.com/terms/v/voucher-check.asp. The voucher is an integral document for accounts payable, as it is an "internal accounting control mechanism" that shows payments are properly authorized and received. *Id.*

19

*Citynet, LLC*, 772 S.E.2d at 49. In light of the above, the Hospital satisfied the requirements of the WPCA by paying Plaintiff the funds due to her on January 3. While Plaintiff's argument may be a creative twisting of the statute, it is nonetheless without merit.

Therefore, for the foregoing reasons, Defendants' motion is **GRANTED** as to Plaintiff's claim under the Wage Payment and Collection Act, and Count IV is hereby **DISMISSED**.

### IV. CONCLUSION

For the reasons more fully explained above, Defendants Partial Motion to Dismiss, (ECF No. 24), is **GRANTED**. Counts I, III, and IV of Plaintiff's Amended Complaint are hereby **DISMISSED**. Further, as no claims survive against Defendant Aldrina Archie, she is **DISMISSED** from this action.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: January 12, 2022

THOMAS E. JOHNSTON, CHIEF JUDGE